UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 8:12-cr-205-T-17MAP

NATHANIEL HARRIS, *et al.*,
_____/

## REPORT AND RECOMMENDATION[1]

Deonte Martin is accused with others in a sweeping indictment charging a RICO

conspiracy, controlled substance offenses, firearm violations, and multiple murders (doc.

82).[2] He moves to suppress statements he made to various law enforcement officers on three

separate dates, offering different reasons for each (doc. 467).  His arguments dealing with

the first two interviews are straightforward: the officer should have Mirandized him for the

first, and he was too high on drugs for the second to be voluntary.  Regarding the third

interview, which occurred six months after his sentencing on federal drug offenses, his

arguments are multi-faceted: the entire interview should be suppressed because agents

violated the six-hour safe-harbor provision of 18 U.S.C. § 3501(c); alternatively, the

interview should be suppressed because Martin invoked his right to remain silent in two

earlier encounters with agents, or portions of the interview should be suppressed because

Martin again invoked his right to remain silent during the course of the interrogation (once

_____

[1]  The District Judge referred this motion to me for a hearing, if necessary, and a
report and recommendation.  Doc. 516.  I held oral argument on the motion on March 22,
2016.

[2]  Martin is charged in six of the counts: Count One (RICO conspiracy), Count Two
(drug conspiracy), Count 25 (use of a firearm to kill Brenton Colemen in furtherance of
RICO conspiracy), and Counts 26-28 (firearm and drug offenses).

in the middle of in the interview and once near the end of the interview).   After an evidentiary hearing, I find Martin's arguments unpersuasive for the first two police encounters: he was not in custody during the first interview (August 1, 2013), and he was certainly lucid enough on the second (August 8, 2013) to voluntarily waive his right to remain silent and to voluntarily speak to interrogating agents.  But for the third interrogation (June 13, 2014), I find that he invoked his right to remain silent earlier than the government acknowledges, and the questioning agents failed to scrupulously honor his invocation. Accordingly, I recommend his motion be granted in part and denied in part.

## I.

*August 1, 2013 – Martin's house*

Detective Levita and Officer French questioned Martin in Martin's front yard on August 1, 2013, the day Brenton Coleman was killed at the Dream Center in Manatee County (this murder is the subject of Count 25).   Martin argues the statements he made to the police that night should be suppressed because the officers did not advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The government counters that Martin was not in custody at the time (rendering compliance with *Miranda* unnecessary).

The Fifth Amendment provides to every person a right against self-incrimination, U.S. Const. amend. V.   Courts are required to exclude from evidence incriminating statements a defendant makes before being warned of his rights to remain silent and to obtain counsel.   *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010).   It is undisputed that a defendant is entitled to this warning only "when custodial interrogation begins."  *Id.*, quoting *United States v. Acosta,* 363 F.3d 1141, 1148 (11th Cir. 2004).  While

the burden is on the prosecution to show by a preponderance of the evidence that a defendant's in-custody statements were voluntary and obtained in compliance with *Miranda*, *see Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004), the defendant bears the burden of establishing he was in custody and the statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533-34 (5th Cir. 1977);[3] *United States v. Peck*, 17 F.Supp.3d 1345, 1354-55 (N.D. Ga. 2014). A defendant is in custody for *Miranda* purposes "when there is a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest." *United States v. Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).[4] This test is an objective one. *Howes v. Fields*, __ U.S. ___, 132 S.Ct. 1181, 1189 (2012) (citations and quotations omitted); *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). A reasonable innocent person standard applies; the subjective beliefs of the defendant and the interviewing officers about whether the defendant is free to leave are irrelevant. *See Luna-Encinas*, 603 F.3d at 881. No one fact is outcome determinative. *See Brown*, 441 F.3d at 1349. Instead, courts weigh the totality of the circumstances, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that

_____

[3] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[4] Even if a reasonable person in the defendant's position feels he is not free to leave a police encounter (*i.e.*, seized for Fourth Amendment purposes), he will not necessarily be in custody for Fifth Amendment and *Miranda* purposes. *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006). Seizure is a necessary but not a sufficient condition for *Miranda* to attach; the defendant's liberty must be constrained to the degree associated with a formal arrest. *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010); *Luna-Encinas*, 603 F.3d at 881.

compliance with the officers could be compelled," *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (citation and quotation marks omitted), as well as "the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of questioning." *Howes v. Fields*, 132 S.Ct. at 1189. Courts are "much 'less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" *Luna-Encinas,* 603 F.3d .at 882, quoting *Brown*, 441 F.3d at 1348; *Beckwith v. United States*, 425 U.S. 341, 345-47 (1976). Against these standards, Martin fails to show he was in custody when the officers questioned him in his front yard.

Around 9:00 p.m. on August 1, 2013 – within hours of the Dream Center murder – Detective Levita (who was not in uniform) and Officer French drove an unmarked police car to Martin's house. They were investigating the murder and planned to question Martin about his whereabouts at the time of the shooting. Martin was in his front yard with another man when the officers arrived. The other man went inside the house while Martin approached Det. Levita.

Det. Levita identified himself to Martin. Then, without issuing a *Miranda* warning, the detective asked Martin if he had heard about the shooting and where he was earlier that night. Martin said he was not at the Dream Center; he was in Palmetto visiting a girlfriend and then at a 7-11 close to his house getting gas. He said his cousin had called him to tell him about Coleman's murder. At some point, Martin said his cousin was inside the house, and Det. Levita asked if he would answer some questions. Martin went inside the house between two and four times during Det. Levita's questioning, presumably to talk to his

cousin.  Each time Martin closed the front door, stayed inside for a period of time, and returned to talk with Det. Levita.

Meanwhile, Det. Levita waited in the front yard (Martin told Levita about the python in the front room which Levita could see when he peered into the front door with his flashlight; that circumstance persuaded Levita to stay put).  Although Levita was carrying his firearm at the time, it was holstered throughout the encounter.  It is unclear from the testimony if any officers other than French and Levita were there.  But there is no record evidence that the house was surrounded with officers as Martin alleges in his papers.[5]  Levita testified there were no officers at Martin's back door and that officers did not brandish weapons during the encounter.  Det. Levita recalls he spoke calmly to Martin; Martin did not give him trouble; and Martin answered his questions. The encounter in the front yard lasted between 30 and 40 minutes, due in part to Martin's trips in and out of the house to talk with his cousin (who eventually emerged).  Det. Levita shook Martin's hand and left.

Weighing the totality of the circumstances, I find that Martin has not met his burden of proving the interview in his front yard rose to the level of restraint associated with a formal arrest.  Officers did not handcuff Martin, did not physically touch him (other than to shake his hand), did not draw their guns, and did not verbally intimidate him.  Martin "was on familiar ground in his front yard."  *Luna-Encinas*, 603 F.3d at 882.  When Martin asked to go inside his house and talk with his cousin, Det. Levita let him.  At no point did Martin tell Det. Levita that he did not want to answer questions.  Martin was free to return to his

---

[5] Martin did not testify at the suppression hearing so the government's evidence is uncontroverted here.

house once the interview ended.[6]

Under these circumstances, a reasonable innocent person in Martin's situation would not feel he was restrained to the point he was not free to leave. Because I find Martin was not in custody during the interrogation, no *Miranda* warning was required. I recommend that Martin's motion be denied as to his August 1, 2013, statements.

## II.

*August 8, 2013 – Martin's arrest*

A week after the front yard encounter, authorities arrested Martin pursuant to a warrant at a Taco Bell in Bradenton on federal drug charges.[7] Although Martin was arrested for drug offenses, Det. Carulla (of the Bradenton Police Department) and Det. Bliss (of the Manatee County Sheriff's Office) questioned Martin about the Dream Center killing in an interview room at the MCSO about two hours after the arrest.[8] Martin contends his statements were involuntary – he was too high on controlled substances. The facts show otherwise.

---

[6] Martin alleges in his motion that officers took his driver's license and never returned it. The only evidence before me is Det. Levita's account that he did not take Martin's license; in fact, he recalled that Martin did not have his license with him.

[7] *See United States v. Deonte Martin*, Case No. 8:13-cr-391-T-23TGW. That indictment charged Martin with distributions of crack cocaine on July 5, July 8, and July 9, 2013. Martin eventually pleaded guilty to all three counts. This conviction has relevance to the issues pertaining to Martin's June 13, 2014, statements which are the subject of Part III (*infra*).

[8] Martin suggests this bait and switch is improper. It is not. Police may tell a suspect they want to question him about a certain crime, obtain a *Miranda* waiver, then change the topic to another crime. *United States v. Brenton-Farley*, 607 F.3d 1294, 1327 (11th Cir. 2010). Whether a waiver is knowing and voluntary does not depend on what the defendant believed to be the topic of questioning, but on whether he understood his rights and made a voluntary decision to answer questions.

When the detectives enter, Martin is sitting at the table with his head down.  The 20 minute interview begins with Det. Carulla asking, "You sleeping?" (Gov't Ex. 1b at p.1, l. 2).  When Martin responds he is okay, Det. Carulla reads Martin his *Miranda* rights.  Martin says he understands his rights and begins answering questions.  He tells the detectives he clearly remembers the night Brent Coleman was killed.  He adds he was not at the Dream Center that night; he picked up his cousin in Bradenton and drove to a friend's house in Palmetto and was "chilling with a girl named Mosha." (*Id*. at p. 5, l. 91).   He stayed there from dusk until around 10 p.m.  Then he drove to his sister's aunt's house, where he stayed until 3 a.m.  Around that time, he drove his Lincoln Navigator to the 7-11 in Bradenton for gas.

Toward the end of the interview, Det. Carulla abruptly asks, "like right now are you impaired?"  (*Id*. at p. 23, l. 464-65)  Martin admits to being "high as f__k" on weed and Lortab.  (*Id*. at l. 471).  Carulla asks Martin, "[o]kay so you don't even know what's going on?"  (*Id*. at l. 477).  And Martin replies, "I – yeah, you right there."  (*Id*. at l. 478).  Det. Carulla then asks Martin a series of questions:  who is President of the United States? What city were they in? What year is it?  What day is it?  What month is it?  Martin answers most of the questions correctly but says it is 2010 instead of 2013, and he does not know the day of the week.

Satisfied, Det. Carulla resumes questioning Martin about Coleman's murder.  After again denying he was at the Dream Center football field that night, Martin says: "Are you trying to say that I killed the man, that's what you're saying?" (*Id*. at p. 25, l. 522).  Det. Carulla responds: "I'm basically saying that you were definitely out there yeah." (*Id*. at l.

523).  Then Martin states: "Alright, well look now, I don't want to talk to you no more, I won't talk to you all no more, I ain't kill this man, I don't know what you talking about, you all tripping." (Id. at p. 26, l. 524-26).  After a brief exchange, the interview ends.

Martin clearly was in custody during this interview.  He was formally arrested, placed in handcuffs, and read his *Miranda* rights.  The question is whether his waiver of his *Miranda* rights and his subsequent statements were voluntary even though he admitted he was high (the detectives even commented that Martin's car smelled like marijuana when they arrested him).  The burden is on the government to prove by a preponderance of the evidence that Martin's statements were voluntary.  *Missouri v. Seibert*, 542 U.S. at 608 n.1.[9]

To prove a valid *Miranda* waiver, the government must show the waiver represented an "uncoerced choice," and the defendant understood both the nature of the rights he was waiving and the consequences of the waiver.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010).  To determine this, courts look to the "totality of the circumstances."  *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014).  There is no *per se* rule mandating that all Miranda waivers by intoxicated defendants are inadmissible.  *See, e.g., United States v. Carson*, 582 F.3d 827, 833-34 (7th Cir. 2009) (waiver valid even though defendant claimed he was intoxicated and had taken heroin and cocaine before talking to police because he was alert and coherent and gave no sign he had taken drugs); *United States v. Palmer,* 203 F.3d 55, 60-61 (1st Cir.

---

[9]  It is unclear from Martin's motion whether he challenges the voluntariness of his *Miranda* waiver, the voluntariness of the statements he made post-waiver, or both.  But it does not matter; the test is the same.  *See Colorado v. Connelly*, 479 U.S. 157, 523 (1986).  I find under a totality of the circumstances that Martin's alleged intoxication did not render his decisions involuntary.

2000) (waiver valid despite defendant's heroin withdrawal and use of antidepressants).  This is true for statements as well.  *See Grayson v. Thompson*, 257 F.3d 1194, 1230 (11th Cir. 2001) (finding confession voluntary despite defendant's allegation he drank gallons of wine before the interview); *Carson*, 582 F.3d at 834; *Palmer*, 203 F.3d at 60-61.  A defendant's statement to authorities is voluntary if it is "the product of a rational intellect and a free will."  *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (quotation omitted).  If a defendant alleges he was under the influence of drugs or alcohol when he made his statements, the question is whether the defendant's "will was overborne at the time he confessed." *Lynumn v. State of Illinois*, 372 U.S. 528, 534 (1963); *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009).

The government has sustained its burden as to the voluntariness of Martin's waiver and statements.  While there is no evidence a drug test was performed on Martin on August 8, 2013, the evidence that he was drug-impaired is his admission he was high and had taken a Lortab, his inability to recall correctly the year and date, and the detectives' statements that Martin's car reeked of marijuana when he was arrested (about two hours before his interview).  Even assuming he was high at the time of his interview, there is no evidence his will was so overpowered by his drug use that he was incapable of rational thought and free choice.  He was aware of what he was saying.  *Parker v. Allen*, 565 F.3d at 1280 ("Intoxication short of . . . impairment of the will and mind as to make the individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.").  He testified he had a clear memory of the night of the murder.  He answered the detectives' questions coherently.  He was compliant and alert.  He provided

understandable, on-point answers.  The transcript shows Martin was able to comprehend the *Miranda* warnings, the significance of waiving them, and the questions that followed. Martin's motion should be denied as to his August 8, 2013, statement.

III.

*June 13, 2014 – Pinellas County Jail Interview*

This interview occurred about six months after a district judge in this division sentenced Martin to three concurrent terms of imprisonment of 131 months for distributions of cocaine base that were the subject of the August 8, 2013, arrest and about two weeks after the grand jury returned the instant indictment.  Soon after the grand jury's return, the government's attorney initiated two actions:  he requested the clerk issue a bench warrant, and he submitted a written request to the United States Marshal to have Martin transported to the Tampa Division for his arraignment (*see* 18 U.S.C. § 3621(d)).[10]  The marshal executed the arrest warrant on June 10, 2014, while Martin was confined in the Seminole County Jail en route from Tallahassee FCI to Tampa (doc. 119) (a date Martin considers important for his 18 U.S.C. § 3501(c) argument).  Three days later, two ATF agents interviewed Martin at the Pinellas County Jail, the marshal's customary contract detention facility for defendants awaiting trial in the Tampa Division.  Martin levels two complaints about this interview. Agents interrogated him well beyond the six-hour safe-harbor window allotted by 18 U.S.C. § 3501(c); accordingly, his statements should be suppressed on this ground alone.  Next, he had invoked his right to remain silent in two previous encounters

---

[10]  This provision provides that for court appearances, "[t]he United States marshal shall, without charge, bring a prisoner into court or return him to a prison facility on order of a court of the United States or on written request of an attorney for the Government."

with agents (July 8, 2013, August 8, 2013, and May 14, 2014) and he twice invoked his right to remain silent during the course of the interview.[11]  Hence, agents should have honored his early invocations and not questioned him at all.  Alternatively, he invoked his right to remain silent twice during the interrogation, and the agents failed to honor either invocation.  The government counters that most of Martin's arguments are without merit; the exception is Martin's second invocation.  For that contention, the government agrees and says it will not offer in its case-in-chief any statements Martin made after that invocation (*i.e.,* Gov't Ex. 6, at p. 82, l. 1696).[12]

### A.  18 U.S.C. § 3501

One of the premises to Martin's theory for suppression rests on the significance he applies to the marshal's execution of the arrest warrant a few days before the interview.  Perceiving that to be a seminal event, Martin then extrapolates a host of rights that should have accrued to him: the arresting marshal should have taken him "without unnecessary delay" to the nearest magistrate judge in accordance with Fed. R. Crim. P. 5(a)(1)(A)[13]; his statements should be suppressed under 18 U.S.C. § 3501(c) as they occurred well beyond that statute's six-hour safe-harbor period; and he is entitled to all the protections *Miranda*

---

[11]  The agents recorded the interview.  *See* Court Ex. 1 (recording); Gov't Ex. 6 (sealed transcript).

[12]  Notably, neither side identifies the incriminatory statements Martin made during the course of the June 13 interview.  In the main, many of his comments seem like those he earlier made.  The government suggested at the suppression hearing it will use Martin's June 13 statements not for their truth but their falsity.  And it says Martin added one new piece of information he had not mentioned in previous police interviews: he had provided a firearm to J-Baby prior to the Dream Center murder.

[13]  Fed. R. Crim. P. 9(c)(1)(B) states the "officer executing the warrant must proceed in accordance with Rule 5(a)(1)."

offers – including the scrupulous adherence to his invocation of his right to remain silent. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) ("We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'"). If this were the typical criminal case involving a defendant arrested off the streets, Martin's premise would be a sound starting point for the analysis. But Martin was not that defendant. He was an inmate serving a federal sentence. And his type of "custody" differs from that types of "custody" Rule 5 and § 3501(c) envision.

Clearly, not all custody is the same, nor does every form of custody trigger the same protections. *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (*i.e.*, "We have never decided whether incarceration constitutes custody for *Miranda* purposes, and have indeed explicitly declined to address the issue."). In *Shatzer*, for example, the Court determined that lawful imprisonment imposed upon a conviction of a crime did not necessarily create the coercive pressures identified in *Miranda*. *Id.* at 113. *Miranda*, the Court said, should not be accorded "'talismanic power'"; instead, it should be enforced "'only in those situations in which the concerns that powered the decision are implicated.'" *Id.*, quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). Thus, the Court refused to give the presumption of involuntariness established in *Edwards v. Arizona*, 451 U.S. 477, to an inmate who, after invoking his right to counsel, had been returned to the general population and then questioned again about the same crime two and half years later. A convicted inmate's custodial status did not necessarily transform into a custodial status that *Miranda* protects. "Without minimizing the harsh realities of incarceration, we think lawful imprisonment imposed upon a conviction

of a crime does not create the coercive pressures identified in *Miranda*." *Shatzer* at 113.

This reasoning applies equally to Rule 5 and § 3501(c).[14]

Rule 5 is "a compendious restatement, without substantive change, of several prior specific federal statutory provisions" that informs an officer making an arrest under a warrant based on a complaint or making an arrest without a warrant to take the person without any unnecessary to delay to the nearest commissioner. *Corley v. United States*, 556 U.S. 303, 307-08 (2009). This "presentment" rule applies to those who were at liberty before the arrest and is aimed at discouraging their "'secret interrogation.'" *Id.* (citations omitted). It has no application to those like Martin who are serving a prison sentence and are charged with committing a new offense. *See United States v. Presley*, 487 F.3d 1346, 1349 (11th Cir. 2007) (rules imposing procedures for taking someone into custody did not apply to individual subject to supervised release as he is already in "constructive custody");

---

[14]  Section 3501(c) provides:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

*United States v. Harrison*, 461 F.2d 1127, 1130 (5th Cir. 1972) (a parole violator is not technically arrested as Rule 5(a) contemplates); *United States v. Keaveny*, 405 F.2d 821 (5th Cir. 1969) (right of accused to a prompt hearing before a magistrate does not apply to an escapee already in legal custody); *Rademacher v. United States*, 287 F.2d 100, 101 (5th Cir. 1960) ("The "*McNabb* rule, that a confession is inadmissible if made during illegal detention due to failure to carry a prisoner before a committing magistrate, does not apply where a prisoner is in legal custody."). Indeed, the arrest warrant was superfluous as Martin was already in custody. Given that circumstance, the prosecutor simply needed to arrange Martin's presence before this Court to answer to the indictment. And the prosecutor's § 3621(d) request to the marshal, which served much like a writ of habeas corpus ad prosequendum, accomplished that.

### B.  Invocations

Again, Martin's arguments are two-fold, and both deal with the respect due to his invocations to remain silent. Namely, agents should have honored the invocations he made in the two interviews that occurred before June 13; the first took place almost a year before June 13 and the second occurred a month before June 13. Next, agents failed to honor his invocations during the June 13 interview. The principles covering the deference due to the before and during invocations are different. Martin's arguments about the early invocations are without merit; his arguments for his invocations during the interrogation are not, as the government partly admits.

### a.  prior to June 13th interview

Police interviewed Martin on August 8, 2013, shortly after his arrest on the federal

indictment for which he ultimately pleaded guilty to and was sentenced to lengthy terms of imprisonment.  At some point during that questioning, he invoked his right to remain silent (*see* Part II).  On May 14, 2014, while at the Citrus County Jail awaiting the Bureau of Prison's designation, ATF agents armed with a warrant swabbed Martin's cheek for DNA. During that encounter, the agents attempted to question him; he refused their entreaties.

All this occurred no less than a month before the same agents interrogated Martin on June 13.  *Schatzer*, as the government points out, identified a 14-day break between interrogations as the appropriate temporal period for affording an the time "to get reacclimated to his normal life, consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id* at 110-111 (citations omitted).  Martin's arguments that the agents should have respected his earlier invocations are without merit.

### b.  during the June 13th interview

Martin's invocations during the June 13 interview are a different matter.  As noted previously, the government says it will not offer any statements Martin made after his second invocation to remain silent that occurred near the end of the June 13 interview. This concession is significant for two reasons.  First, the government by its silence on the issue and its acknowledgment that agents should have honored Martin's later invocation necessarily concedes Martin was in custody for *Miranda* purposes.[15]

---

[15] As discussed previously, not all custody is the same.  The question here is whether Martin's custodial status moved into *Miranda*'s protective ambit and thereby required the questioning agents to scrupulously honor his invocation to remain silent. Clearly, imprisonment alone does not meet the standard; instead, the test for answering this question is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 132 S.Ct. at 1190. As also noted previously, it is Martin's burden to show this.  The government does not

Consequently, the only real issue to decide is whether Martin's claimed invocation differs from the one the government accepts.   The government claims the two are distinguishable, but I can discern no distinction between them.   And frankly their juxtaposition is as revealing an exercise as any other: compare Martin's first invocation – "I just got through talking to you" – with his second invocation the government now accepts – "I'm done talking about it."  *See* Gov't Ex. 6 at p. 62, l. 1286 and p. 82, l. 1693.  Although the government submits that the agent interpreted Martin's statement ("I just got through talking to you") as Martin's effort to change the topic (from answering whether someone ordered Martin to do the murder to answering whether Martin knew if co-defendant Corey Harris was involved), the government's logic avoids the applicable standard that governs the analysis.  In sum, it is not the interrogating agent's subjective belief that controls.  It is enough that Martin articulated his desire to remain silent with sufficient clarity so that a reasonable police officer under the circumstances would understand the statement.  *United States v. Davis*, 512 U.S. 452, 458-59 (1994) (clarity of invocation of right to counsel determined objectively from perspective of reasonable police officer); *Berghuis v. Thompson*, 560 U.S. 370, 381 (2010) (*Davis* standard applies to right to remain silent).  "If the statement is ambiguous or equivocal, then the police have no duty to clarify a suspect's intent, and they may proceed with interrogation."  *United States v. Acosta*, 363 F.3d 1141,

---

contest Martin's claim that he was in custody.  And, I find his arguments sufficiently persuasive on this score.  *Fields* teaches that "[w]hen a prisoner is questioned, the determination of custody should focus on all the features of the interrogation." *Id* at 1192.  When agents questioned Martin, unlike those who questioned Fields, Martin was not at his designated custodial facility (his home, as *Field* describes) but in administrative hold in a detention facility.  And unlike Fields, Martin knew he had been charged anew in federal court.  These circumstances are akin to the relevant environment *Miranda* addresses.

1152 (11th Cir. 2004) (citation and quotations omitted).  But Martin's first invocation is not qualitatively different from the second.  As a result, having invoked his right to remain silent – as Martin did – the questioning agents should have "scrupulously honored" Martin's desire remain silent and should have cut off further interrogation.  *Mosley*, 423 U.S. at 102-04 (police must "scrupulously honor" suspect's invocation of right to remain silent, although there is no *per se* rule that police cannot recommence questioning); *Jackson v. Dugger*, 837 F. 2d 1469, 1471-72 (11th Cir. 1988) (same).

IV.

For the reasons stated, I recommend Martin's motion to suppress (doc. 467) be GRANTED to the extent that those statements he made on June 13, 2014, after his first invocation to remain silent should be suppressed (*see* Gov't Ex. 6 at p. 1286, *et seq.*).  In all other respects, his motion should be DENIED.

IT IS SO REPORTED in Tampa, Florida on April 7, 2016.

*Mark A. Pizzo*

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.